[Civ. No. 24990. Fourth Dist., Div. One. Dec. 24, 1982.]

JULIE FISHER, Plaintiff and Appellant, v.
YVONNE LARSEN et al., Defendants and Respondents.

628

**COUNSEL**

Julie Fisher, in pro. per., for Plaintiff and Appellant.

Hillyer & Irwin, Oscar F. Irwin, Margaret Z. Johns, Gray, Cary, Ames & Frye, David E. Monahan and Marilyn L. Huff for Defendants and Respondents.

**OPINION**

**WORK, J.**—Following an aggressive election campaign, highlighted by intense media coverage, Julie Fisher lost her seat on the San Diego Unified School District Board of Education. Fisher blames her defeat on defamatory statements made by members of her successful challenger's camp, and libels published in local newspapers.

In this defamation action, Fisher, acting as her own attorney, appeals summary judgments in favor of her successor, Yvonne Larsen, and certain Larsen campaign workers; summary judgments in favor of reporter Michael Scott-Blair and Copley Press Inc. (Copley); and orders sustaining demurrers to certain causes of action. Because there remain triable issues of fact, we reverse one of the summary judgments for Copley and Scott-Blair, and each summary judgment favoring Yvonne Larsen and her campaign workers (except for designated parties). We affirm the order sustaining demurrers and reject other claims of error cited by Fisher. Finally, we hold the causes for Fisher's failure to prevail in the election are too uncertain to allow her to recover special damages reflecting the lost future and financial benefits of that position in a defamation action.

## Factual Background

The contested 1977 election closely followed an illegal, widely publicized, four-day teachers' strike by the San Diego Teachers' Association (Union) after which Fisher and other school board members granted amnesty to the strikers although the strike activities violated a court injunction. During the primary and general elections campaigns, Fisher and Larsen engaged in a series of bitter claims and counterclaims extensively reported by the two local Copley Press, Inc. newspapers, (the San Diego Union, and the Tribune) and other local media outlets.

Fisher's suit charges the Larsen campaign defendants,[1] San Diego Union reporter Scott-Blair, and Copley with conspiring to defame her during the campaign. She cites various publications: some describing her actions during the teachers' strike in a manner which, in other contexts would have been innocuous but, given her official status and the apparent media and community hostility toward the illegal strike, proved to be politically improvident, and other publications explicitly accusing her of attempting to bribe and blackmail a public official, the superintendent of schools.

## The Summary Judgments

When overruling demurrers to causes of action based upon these allegations in Fisher's *first* amended complaint, the trial court determined the following separate public statements were reasonably subject to a defamatory per se interpretation:

1. Yvonne Larsen's press-conference question: "Do taxpayers like it when Fisher appears at Union rallies and supports their demands?" (susceptible to an interpretation Fisher, an elected school board official, approved and aided an illegal strike by the Union).

[1]Yvonne Larsen, W. Daniel Larsen, her husband, Joseph Harmon and Edwin Gray.

2. Contents of a San Diego Union article headlined "Support for Teacher's Union," containing the apparently factual assertion "She openly supported the teachers during their four-day strike in June" (a claim suggesting Fisher was guilty of breaching her official trust).

3. A San Diego Union article flatly stating "Fisher *supported and marched with the striking teachers* last June." (The inaccuracy of the assertion Fisher marched with the strikers was admitted in a later San Diego Union editorial.)

4. Public charges by Yvonne Larsen accusing Fisher of:

(a) threatening to expose the school board superintendent to false charges of misconduct and illegal acts sufficient to cause him to lose his position unless he officially collaborated with the Union, which Larsen characterized as "outright blackmail" and "nothing less than blackmail."

(b) being associated with the illegal teachers' strike "every step of the way;" and

(c) violating her official public trust by disclosing confidential, privileged information to the plaintiffs in a school integration case to which the school board was an adverse party.[2]

5. Press reports of the Larsen "blackmail" charge in news coverage of the meeting during which the accusations were made.

6. Miscellaneous public comments by Yvonne Larsen that Fisher "repeatedly said she would support striking teachers."

7. Yvonne Larsen's charges in a press release accusing Fisher of: (a) violating school district policies and state and federal laws by infringing upon the students' right to privacy; and (b) violating her oath of office by collaborating in the illegal teachers strike.

8. The San Diego Union's slanted reporting of Larsen's privacy invasion remarks in an article headed "Pupil Privacy Law Broken by Fisher, School Aide Says." (Unobtrusively buried in the article is the aide's acknowledgment both Fisher *and the school district had unintentionally* violated the privacy laws.)

9. A news article suggesting Fisher had stated she would support illegally striking teachers under similar circumstances in the future.

---

[2]Carlin v. Board of Education, San Diego Superior Court No. 303800.

Each of these publications are discussed hereafter in the context of the causes of action to which it relates.

## Discussion

The holding of *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412], bars a public figure, from recovering for defamation unless actual malice is shown by clear and convincing evidence. This requires showing the disseminator of the falsehood either knew it to be untrue or made the publication with reckless disregard for truth.

The summary judgments· may be upheld only if the evidence, construed favorably to Fisher, raises no triable issues of fact. It is not sufficient the moving declarations, standing alone, would support a defense judgment.The trial court may not weigh the credibility of declarants nor pass on the merits of the issues presented, and must construe movants' declarations strictly. (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 851-852 [94 Cal.Rptr. 785, 484 P.2d 953].)

■ Where allegedly libelous remarks can be understood by an average reader to be either a nonactionable expression of opinion or as a purported truthful statement of fact, the issue may not be resolved by summary judgment, but is one for the trier of fact. (*Slaughter* v. *Friedman* (1982) 32 Cal.3d 149, 154 [185 Cal.Rptr. 244, 649 P.2d 886].) However, where media publications are couched in ambiguous terms, a finding of actual malice may not be found unless the jury is convinced "not only that the words were reasonably understood in their defamatory, factual sense, but also that the defendant either deliberately cast his statements in an equivocal fashion in the hope of insinuating a defamatory impact to the reader, or that he knew or acted in reckless disregard of whether his words would be interpreted by the average reader as defamatory statements of fact." (*Good Government Group of Seal Beach, Inc.* v. *Superior Court* (1978) 22 Cal.3d 672, 684 [150 Cal.Rptr. 258, 586 P.2d 572].) However, whether the publications are forthright or ambiguous, there must be some showing of potential actual malice to avoid summary judgment on that issue. (*Id.,* at p. 685.)

Fisher, not a lawyer, claims the allegations of actual malice in her unverified complaint satisfies the required showing of actual malice. Fisher misconstrues her burden. While a demurrer tests the sufficiency of the pleadings and, in some instances, material allegations may be pleaded in the form of ultimate facts and in conclusionary language, summary judgment is designed to determine whether triable issues facially raised by the pleading are "real or merely the product of inept pleading." (*Coyne* v. *Krempels* (1950) 36 Cal.2d 257, 262 [223 P.2d 244].) Code of Civil Procedure section 437c requires a valid com-

plaint be dismissed "'unless the other party, *by affidavit or affidavits,* shall show such facts as may be deemed by the judge hearing the motion sufficient to present a triable issue of fact.'" (*Coyne* v. *Krempels, supra,* at p. 262.) Allegations of a pleading may not be considered by a trial court to support or to oppose a summary judgment. (*Id.,* at pp. 262-263.) Apparently, because she relied substantially upon conclusionary allegations of actual malice in each cause of action of her unverified complaint, Fisher filed only a short nonfactual declaration attached to her points and authorities and answers she made to Yvonne Larsen's interrogatories. Thus, our review is limited to the numerous depositions provided the trial court, Fisher's answers to interrogatories, and declarations in support of the summary judgment.[3]

### "Partial" Summary Judgments[4]

#### *Special Damages for Losses Flowing From Fisher's Election Defeat*

In each cause of action, Fisher's only claim for special damages is based upon the loss of her elective office and its attendant earnings (salary, dental benefits, trips and other benefits). Civil Code section 48a, subdivision 4(b), relating to news media, defines special damages as those suffered in respect to property, business, trade, profession or occupation and money spent as a result of the alleged libel and allows these to be recovered even where there is no demand for retraction.

The question of whether special damages limited to benefits and salaries, obtainable only by election to public office, are recoverable in a defamation[5] action appears to be one of first impression in this state although it has previously been considered in other jurisdictions.

In *Southwestern Publishing Co.* v. *Horsey* (9th Cir. 1956) 230 F.2d 319, the court considered whether a defeated judicial officer could recover lost future financial perquisites of office in a defamation action. The court found them too uncertain and speculative because a thousand factors might influence an elec-

---

[3]Without relevant opposing declarations, or citations to the material portions of the 40 depositions and other documents subsequently lodged, it is not surprising the trial court failed to locate the relatively few items supporting Fisher's position.

[4]Code of Civil Procedure, section 437c reads in part: "If it appears that the proof supports the granting of [a summary judgment] motion as to some but not all the issues involved in the action, . . . the court shall, by order, specify that such issues are without substantial controversy . . . and the action shall proceed as to the issues remaining."

[5]We do not consider the propriety of seeking such damages as an adjunct to other legal actions, although we are aware they have been disallowed for personal injury (*Chrysler Corp.* v. *Todorovich* (Wyo. 1978) 580 P.2d 1123, 1124), and for conspiracy (*Ferguson* v. *Washburn* (Tex. 1928) 4 S.W.2d 574, 576).

tion, including the extent of newspaper coverage, political leanings of people moving into and out of an area, political party support, group endorsements, volunteer workers' efforts, personal campaigning by the candidates, events in which the candidates participated that might affect their popularity, political trends, and issues debated. The court concluded looking into the causes of election defeats was akin to opening Pandora's box.

A similar holding in *Otero* v. *Ewing* (La. 1926) 162 La. 453 [110 So. 648, 650, 56 A.L.R. 249], was delivered with the pithy comment: "It is common knowledge that there are many surprises at the result of elections by the people." (Accord, *Field* v. *Colson* (1982) 93 Ky. 347 [20 S.W. 264, 265]; *Taylor* v. *Moseley* (1916) 170 Ky. 592 [186 S.W. 634, 637]; *Lynch* v. *Republic Pub. Co.* (1952) 40 Wn.2d 379 [243 P.2d 636, 640]; *Gough* v. *Tribune-Journal Company* (1954) 75 Idaho 502 [275 P.2d 663, 668].)

The evidence shows Fisher's reelection was vigorously and publicly opposed by the ten outspoken former school board presidents, by the current school board president and the publisher and editorial staff of the two newspapers having by far the greatest circulation in the district encompassed by this election. In addition, Fisher's opponent was hand picked by the county central committee of a major political party in an effort to have her defeated. Aside from these factors, even a consideration limited to Fisher's press coverage, preceding and during the campaign, reveals the impossibility of assessing the significance to her defeat of these few beats in context of the year-long continuous drumroll of mostly negative publicity.

In this modern technological era with increasingly sophisticated polling techniques, we are reluctant to hold, as a matter of law, there may never be a case in which the evidentiary complexities cited in *Southwestern* may not be overcome. However, the evidence here does not show any possibility Fisher can establish she would have won reelection except for those statements we deemed potentially libelous.

Since we find no triable issue of fact in the issue of entitlement to special damages related to loss of salaries and benefits of Fisher's elected office, we affirm partial summary judgments on that issue in each cause of action in favor of all defendants.

SUMMARY JUDGMENT: THE INDIVIDUAL CAUSES OF ACTION[6]

I. *Larsen Campaign Defendants*

■ A. The charges of "blackmail" and other criminal conduct and breaches of trust sued on in the sixth cause of action were prepared by Edwin Gray,

---

[6]The summary judgments were granted on causes of action pleaded in Fisher's *second* amended complaint; therefore, different causes of action discussed in various portions of this opinion are identically numbered.

reviewed and adopted by W. Daniel Larsen and delivered by Yvonne Larsen during a public debate late in the campaign.[7] Gray described the speech as an effort to make Larsen's campaign more vigorous, and to this end he included charges of "blackmail" and innuendos of "bribery." The speech described Fisher's alleged misconduct and criminality in factual terms, although in his deposition Gray admitted previously knowing Fisher had denied the allegations when they were publicized months earlier in the press. He explains he simply chose to disbelieve so much of the news articles as reported Fisher's denials and explanations, and to accept the hearsay statements attributed to board president Smith who purportedly gave a hearsay version allegedly obtained from the superintendent. Although Gray's declaration in support of his motion for summary judgment is somewhat more self-serving and emphatic, the trial court may not disregard the inference of reckless disregard for truth implicit in Gray's deposition in view of his stated motive to present a more vigorous (Dan Larsen said "hard biting") campaign.

These defendants downplay the significance of the blackmail and bribery charges, citing *Greenbelt Pub. Assn.* v. *Bresler* (1910) 398 U.S. 6 [26 L.Ed.2d 6, 90 S.Ct. 1537]. This decision stresses the policy importance of insulating the news media from unwarranted attacks flowing from exercise of legitimate First Amendment rights. "The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means . . . is a fundamental principle of our constitutional system." (*Stromberg* v. *California* (1931) 283 U.S. 359, 369 [75 L.Ed. 1117, 1123, 51 S.Ct. 532, 73 A.L.R. 1484].)

Greenbelt was charged with including libelous statements of others in its accurate report of a public meeting in which Bresler was accused by several persons of obtaining unfair leverage over the city while negotiating zoning variances permitting him to construct high density housing on land he owned. He was charged with "blackmailing" the city by blocking its efforts to acquire certain other land Bresler owned. The facts reported did not even hint at illegality. The press article correctly attributed the "blackmail" charge to members of the public at that meeting. The Supreme Court held it was simply impossible to believe a reader of the word "blackmail" in the reports "would not have understood exactly what was meant: it was Bresler's public and wholly legal negotiating proposals that were being criticized. *No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense.*" (*Greenbelt Publishing Association* v. *Bresler, supra,* 398 U.S. 6, 14 [26 L.Ed.2d 6, 15].) The court found even the most careless reader would have

---

[7]Harmon is not shown to be involved in the acts of which Fisher complains in her sixth cause of action.

relegated the term "blackmail" to mere rhetorical hyperbole, not an accusation of criminal activity.

However, *Greenbelt*'s facts are far different than Larsen's purported statement of facts which, if true, describe criminal activities and label them as such. As is pointed out in the concurring opinion of Justice White, the Supreme Court "does not deny that the Constitution would permit recovery for charging the crime of blackmail . . . ." (*Id.*, at pp. 21-22 [26 L.Ed. at pp. 18-19].) Public statements purporting to be factual or which may be perceived by a jury to have been presented as factual, rather than opinion, are actionable if they reasonably can be read in the context of the publication as charging a public official with a crime. (See *Good Government Group of Seal Beach, Inc.* v. *Superior Court, supra,* 22 Cal.3d 672, 683; *Gregory* v. *McDonnell Douglas Corp.* (1976) 17 Cal.3d 596 [131 Cal.Rptr. 641, 552 P.2d 425].) Larsen's use of the word "blackmail" in the context of her entire statement reasonably may be interpreted as charging a crime. Further, the reporting of these specific charges, although accurate, is subject to an interpretation by the average reader that the Larsens have accused Fisher of felonious acts.[8]

However, even where the words are reasonably understood in their defamatory factual sense, a defendant is entitled to summary judgment unless the trial court determines there is a sufficient showing of actual malice to warrant submission of that issue to the jury. (*Good Government Group of Seal Beach, Inc.* v. *Superior Court, supra,* 22 Cal.3d at p. 685.)

Here, the question of actual malice turns on whether the Larsens knew the statements were false or made them in reckless disregard of whether they were false. In their defense, the Larsens state the actions which they describe as attempted bribery and blackmail purportedly were made in a face-to-face confrontation between Fisher and superintendent Goodman at a meeting with no one else present. Before making the public statements, the Larsens read two news articles in the San Diego Union, reporting statements made by school board president Smith in which he accused Fisher of asking Goodman to support a list of suggestions she presented to him in an effort to avert the then-pending teachers' strike and support a Fisher espoused school desegregation plan. According to Smith, Fisher told Goodman she would call for his resignation if he did not follow her suggestions and, as a result, the teachers went on strike. The Larsens claim they acted reasonably in their belief in the truth of the statements, basing their belief on a chronological history kept by superintendent Goodman and provided to them before preparing the speech. However,

---

[8]The detailed alleged criminal conduct to support its labeling as "blackmail and bribery" transcends the mere use of such terms as a literary device for ridiculing political conduct. (See Bird, C. J., dis. *Good Government Group of Seal Beach, Inc.* v. *Superior Court, supra,* 22 Cal.3d at p. 689.)

the Larsens knew of the past strained relations between Fisher and Goodman (they acknowledge awareness of Fisher's charges made earlier against Goodman which resulted in litigation and law enforcement investigation) and they reviewed the chronology knowing it was prepared by one of only two parties at the meeting in which the bribe was purportedly offered and the blackmail threats allegedly made.[9]

The Larsens made no effort to check the truthfulness of the chronology as prepared by Superintendent Goodman by contacting either Fisher or Goodman.[10]

Yvonne Larsen, in her declaration in support of summary judgment states: "While declarant is conscious of the bitter attacks upon the school superintendent by [Fisher], declarant had no reason whatsoever to question the veracity or integrity of the superintendent's report of the meeting with [Fisher], or the reports in the newspapers, . . . or the statements of the president of the Board of Education in regard to same."

We cannot tell from the court's order of summary judgment whether it believed there was no triable issue of fact in defendants' defense of truth (that the bribery and blackmail were actually attempted) or whether it simply determined there was no actual malice in the publication. If the former, then the order is erroneous because Fisher's deposition contains repeated and emphatic denials any such threats or promises were made during her face-to-face confrontation with Goodman.

Nor can the order be upheld on the ground there is no triable issue of fact as to whether the accusations of criminal conduct were made with actual malice. Because a trier of fact could resolve the credibility contest over the dispute as to what actually transpired at the Goodman-Fisher confrontation in Fisher's favor, the question is whether the trier of fact could find Larsens' acceptance of

---

[9]Although labeled "blackmail," the language stated only can be reasonably interpreted as an attempt to "obtain . . . an official act of a public officer, induced by a wrongful use of fear" constituting felony of attempted extortion. (Pen. Code, §§ 518, 524.) (*Isaac* v. *Superior Court* (1978) 79 Cal.App.3d 260 [146 Cal.Rptr. 396].) The language is clearly susceptible to the plain meaning Fisher intended to expose some secret of the superintendent damaging to his reputation, in order to force him to subvert his official position to avoid exposure. (Pen. Code, § 519, subd. 4.)

[10]The document relied upon by the Larsens entitled "Chronology and Events Leading To and Occurring During June 6-9, 1977 Teachers' Strike Against San Diego City Schools" was apparently prepared by Goodman *after* the strike had terminated, after the board of education had granted blanket amnesty to the strikers and after Fisher made her charges against Goodman in the open board meeting. (It even contains some poststrike editorial comment by Goodman.) The seven-page "chronology" cannot be read as an unbiased report of events insofar as it refers to Fisher's activities. Yet, it is the only document upon which the Larsens claim to have relied.

Smith's hearsay version without investigation showed a reckless disregard of whether it was false. On this record, we cannot say a jury could not find actual malice. Although well able to do so, the Larsens took no steps to confirm the accuracy of the contents of Goodman's memo by contacting either Fisher or Goodman. And although mere negligence in investigating alone does not establish actual malice, evidence of the complete lack of investigation to determine the truth of the charges, of the Larsens' motive and intent in making the accusations, and their complete disregard of Fisher's denials may, by accumulation and by appropriate inferences, show recklessness.

"The mere profession of a defendant that he believed in good faith that his statements were true does not automatically entitle him to a verdict in his favor." (*Widener* v. *Pacific Gas & Electric Co.* (1977) 75 Cal.App.3d 415, 435 [142 Cal.Rptr. 304], citing *St. Amant* v. *Thompson* (1968) 390 U.S. 727, 732-733 [20 L.Ed.2d 262, 267-268, 88 S.Ct. 1323].) The court in *Goldwater* v. *Ginzburg* (2d Cir. 1969) 414 F.2d 324, 343, states: "[r]eckless is, after all, only negligence raised to a higher power." Further "actual malice" may be inferred when the investigation was grossly inadequate under the circumstances. (*Vandenburg* v. *Newsweek, Inc.* (5th Cir. 1975) 507 F.2d 1024, 1026.)

There are no First Amendment protections for accusations of criminal conduct or personal dishonesty. (*Gregory* v. *McDonnell Douglas Corp., supra,* 17 Cal.3d 596, 604.) Where the information is from a source known to be hostile to the subject against whom the material is to be used, failure to investigate the truth of allegations solely received from this source may support a finding the publication has been made in wanton and reckless disregard of veracity. (*Curtis Publishing Co.* v. *Butts* (1967) 388 U.S. 130, 156-157 [18 L.Ed.2d 1094, 1111-1112, 87 S.Ct. 1975].) Where a public official is involved, whether failure to investigate criminal charges, documented only by information from a source known to be biased against the person accused, shows reckless disregard of their truth is a matter to be decided by the trier of fact. Except as to Harmon, the summary judgments as to the sixth cause of action are reversed.

■■ B. The first and second causes of action charge Yvonne Larsen, her campaign workers, W. Daniel Larsen (her husband), Joseph Harmon and Edwin Gray[11] with preparing and disseminating oral and written defamation consisting of innuendos falsely accusing Fisher of appearing at Union rallies and supporting Union demands at a time when these remarks were likely to be perceived as charging her with collaborating in an illegal strike designed to unlawfully coerce the Board of Education of which Fisher herself was a member. If proved, this is defamatory per se.

---

[11]Gray is not shown to have been involved with the incidents described in these two causes of action which occurred approximately July 27, 1977.

Fisher's evidence shows she has always publicly stated she opposed all teachers' strikes, including the one in June 1977. Further, Harmon and W. Daniel Larsen each admits he was aware Fisher denied supporting the illegal strike *before* they prepared and presented the July 27th speech.

Harmon cannot recall upon what he relied in preparing the first press release about the speech. W. Daniel Larsen stated he held no opinion on whether Fisher favored the strikers going out on strike, only an impression she "was on the teachers' side." The complete lack of concern for the truthfulness of the innuendos of Fisher's collaboration with the illegal strikers is illustrated by this excerpt from W. Daniel Larsen's deposition:

"Q. Was the truth or falsity of that statement that Mrs. Fisher had supported the teachers going out on strike ever discussed in campaign meetings?

"A. No, I think it was just an assumed fact that nobody questioned.

"Q. Did you become aware at some point in time that Mrs. Fisher was making statements to the effect that she had strongly opposed the teachers going out on strike?

"A. Yes, but that didn't change our opinion.

"Q. Did the committee do anything to attempt to determine whether or not Mrs. Fisher was, in fact, correct when she said she had opposed the teacher's strike?

"A. No.

"Q. Was there anyone on the committee who was assigned to do research into the truth or falsity of statements that were made in the course of the Larsen campaign?

"A. No, I don't believe so.

". . . . . . . . . . . . . . . . . . . . . .

"Q. Well, was there ever any member of the committee who said, well, maybe we ought to check it out or talk to someone who was present at that time, or anything of that sort?

"A. Everybody was under the opinion that Mrs. Fisher supported the teachers and the actions that they took, including the strike."

Here, there are triable issues of fact on the issues of falsity and actual malice. Except as to Edwin Gray, we reverse the summary judgments on these causes of action.

C. The ninth cause of action faults Larsen and her campaign workers for accusing Fisher of (1) violating student privacy laws and (2) collaborating with (illegally) striking teachers in violation of her oath of office.

■ That Fisher (as well as the rest of the school administration) violated the privacy laws is undisputed. This statement is not false, and is well within the protected speech of a political campaign.

■ However, if false, the outright assertion Fisher had collaborated with teachers illegally striking against the board of education of which she was a member is defamatory per se. Although the characterization of her conduct as "unethical and unlawful" is couched in opinion form, the charge of "collaboration" is not. The statement is subject to a reasonable interpretation Fisher actively participated with and assisted the teachers in violating the law.

Although Larsen says she relied on media accounts, including the false report in Scott-Blair's article detailing Fisher's march with the striking teachers (see discussion, *post*), she ignores Fisher's published, repeated denials of support for teachers' strikes and the editorial apology for the Scott-Blair misstatements.

Because there is a triable issue of fact as to acutal malice, we reverse the summary judgments on the ninth cause of action, except as to Harmon.

## II. *Copley Press and Scott-Blair*

■ A. The third cause of action accuses Copley Press and Scott-Blair, of defaming Fisher by reporting Yvonne Larsen's press conference, including her question, "Do the taxpayers like it when Julie Fisher appears at Union rallies and supports their demands?" Although the pleadings fault this report as unfair and false, the evidence shows it accurately reports an announcement of candidacy in one of the city's most newsworthy political races. It is clearly fair and neutral reportage of a news event allowing no inference the press was giving credence to the premise contained in Larsen's isolated question, nor undue emphasis upon that remark in context of the entire article. Absent an inference of malice, the trial court properly granted summary judgment on this cause of action.

B. The seventh cause of action complains of the news story (commencing on the *front* page of the San Diego Union's local section and continuing on page 4)

reporting Larsen's October 24th speech and press release under the heading "School Candidate Larsen Accuses Fisher of Blackmail." Fisher does not claim the article is literally inaccurate. (It merely quotes Larsen's general charges of blackmail and perjury which are the subject of the fifth and sixth causes of action, without embellishment or editorial comment.[12]) However, she faults the press for unfairly distorting its coverage of the event at which the charges were made by displaying her political opponent's unproved charges of criminal conduct in the headlines, featuring the attack in the lead paragraphs and burying Fisher's rebuttal. One who reads only the headlines and lead paragraph would never know Fisher also appeared and spoke in the same forum. The San Diego Union admits this news coverage was unfair, as was its coverage of other stories highlighting accusations against Fisher, while omitting or minimizing defalcations of others. An editorial *mea culpa* published *after* the election describes its coverage of the last week of Fisher's campaign as a "blitz of negative stories," characterized by "bumbling non-actions and non-professional operations."

However, no matter how unfairly the article was presented and how cursorily it is read, it is not false. Even the headlines and lead paragraphs accurately attribute the public accusations to Larsen, a political candidate.[13] Therefore, even though elements of actual malice potentially lurk in this scenario, there is no triable issue on whether the publication is false. Summary judgment was proper.

 C. The fourth and fifth causes of action challenge similar allegations made in separate news articles, reasonably subject to interpretation as factual reports of Fisher's endorsement of illegal teachers' strikes. However, because Fisher never formally demanded retraction of these articles, she only seeks to recover the "special" damages limited to loss of the future income and benefits of her lost elective office.[14] Since we hold these damages are not recoverable, summary judgments on the fourth and fifth causes of action were proper.

---

[12]On the inside page, the article mentions Fisher had earlier denied the allegations underlying Larsen's charges, when superintendent Goodman had publicly accused her of threatening to get him if he did not accede to the strikers' demands.

[13]For a historical overview of even more seamy political aspersions, see *Desert Sun Publishing Co.* v. *Superior Court* (1979) 97 Cal.App.3d 49 [158 Cal.Rptr. 519].

[14]Civil Code section 48a, subdivision 1 reads: "In any action for damages for the publication of a libel in a newspaper, or of a slander by radio broadcast, plaintiff shall recover no more than special damages unless a correction be demanded and be not published or broadcast, as hereinafter provided. Plaintiff shall serve upon the publisher, at the place of publication or broadcaster at the place of broadcast, a written notice specifying the statements claimed to be libelous and demanding that the same be corrected. Said notice and demand must be served within 20 days after knowledge of the publication or broadcast of the statements claimed to be libelous."

■ D. In her eighth cause of action, Fisher cites the San Diego Union November 3, 1977, article written by Scott-Blair which bluntly states she had *"repeatedly said she would support the striking teachers* and vote to grant them amnesty should circumstances similar to the June teaching strike arise again."* (Italics added.) Although the article emphatically states Fisher made repeated statements to this effect, there is no evidence she did so.

The press disregarded a formal demand for retraction. Instead of relying on truth as a defense, the press contends the statement, within the scope of the entire article, and in the context of a political campaign, is not defamatory as a matter of law, citing *Desert Sun Publishing Co.* v. *Superior Court, supra,* at pages 51 to 53. However, a newspaper article purporting to be accurate, objective reporting or political analysis, stands separately from partisan political publications produced by openly avowed advocates such as those discussed in *Desert Sun, supra.*

Contrary to these claims, the statement cannot be construed as only a statement of opinion regarding Fisher's future conduct; it purports to be a factual report of Fisher's *declared intent* to support illegally striking teachers in the future.

Scott-Blair states he was unaware of the falsity of this statement when he prepared the article. However, he continuously followed Fisher's campaign from before the June 1977 strike, and knew he earlier falsely reported Fisher had actually marched with the teachers during their illegal strike and knew Fisher publicly denied favoring teachers' strikes. (See San Diego Union editorial, Oct. 17, 1977, "Uplavici Syndrome Strikes Again . . ."). Because there are triable issues of fact here, we reverse the summary judgment on the eighth cause of action.

■ E. For the same reasons we uphold the summary judgment on the seventh cause of action, we approve the one awarded to the press on the tenth cause of action stemming from the November 4, 1977, news coverage of a press conference in which Larsen accused Fisher of breaking school privacy laws. The article augmented Larsen's comments with similar accusations from the school board's attorney. Although the unfairness of its mode of presentation was belatedly editorially admitted by the San Diego Union, its contents are factual.

### III. *All Defendants*

F. Fisher raises no triable issue of fact on the question of whether all or any of the defendants conspired to defame her. Summary judgment was proper on the 11th cause of action.

## THE DEMURRERS WERE PROPERLY SUSTAINED[15]

Even though Fisher's notices of appeal do not specify she is appealing the rulings on demurrers, each party has fully briefed the propriety of the trial court's rulings sustaining demurrers to the sixth, ninth, tenth, fifteenth and seventeenth causes of action in the *first* amended complaint with leave to amend. In response, Fisher filed a second amended complaint in which the causes of action to which demurrers were overruled were restated by eliminating language which the court ordered stricken as surplusage. In spite of the opportunity to amend the sixth, ninth, tenth, fifteenth, and seventeenth causes of action, she did not do so, choosing instead to omit them entirely.[16]

■ On appeal, an order sustaining a demurrer will be upheld if the complaint or portion of the complaint fails to state a cause of action. (Code Civ. Proc., § 430.10, subd. (e).)

The sixth cause of action alleges an article entitled *Julie Fisher Campaign Claims Denied By Others,* published in the San Diego Union reasonably can be understood in the context of the article as calling her a liar. However, campaign claims are often vigorously denied. As stated in *Scott* v. *McDonnell Douglas Corp.* (1974) 37 Cal.App.3d 277, 291 [112 Cal.Rptr. 609]: "The fact that plaintiff takes umbrage at the tone and level of criticism directed against him is not sufficient to sustain an action for defamation. The statements in the instant controversy should be considered in the light of the usual political hyperbole customarily encountered when political figures clash on controversial public matters."

The article contains no actionable defamation.

The ninth cause of action alleged the Larsen campaign defendants defamed Fisher by criticizing her campaign advertising claim that windowless schools are costing taxpayers $100 million extra.

Viewed against the background of a heated political election, the trial court properly concluded Larsen's comments unambiguously expressed only her opinion and as a matter of law were entitled to First Amendment protection.

In her 10th cause of action Fisher attacks the San Diego Union article entitled *Board President Raps Fisher Election Ploy* and subheaded "Schools' High

---

[15]The demurrers were sustained to portions of Fisher's *first* amended complaint.

[16]We question whether Fisher's failure to include these specific causes of action in her superseding, second amended complaint precludes her from attacking the orders sustaining demurrers. (See *Witczak* v. *Johnson* (1956) 146 Cal.App.2d 599, 601 [303 P.2d 1091].) However, the defendants have not argued this point.

Cost Disputed." Larsen's reputed statements are clearly opinion and the court properly determined they were not actionable. (*Okun* v. *Superior Court* (1981) 29 Cal.3d 442 [175 Cal.Rptr. 157, 629 P.2d 1369].)

The 15th cause of action concerned an article published just before election entitled *School Board Expresidents Fault Fisher.* Fisher admits 10 school board expresidents supported her opponent, but claims the story was overplayed. The newspaper, *after election,* editorially admitted it overemphasized the article and admitted failing to comply with general fair-reporting practices and its own reporting policy by not contacting Fisher for her response *before* publication. However, the article is factual, newsworthy in the context of the political campaign, and fully protected under the guarantees of the First Amendment. (See *Miami Herald Publishing Co.* v. *Tornillo* (1974) 418 U.S. 241, 258 [41 L.Ed.2d 730, 741, 94 S.Ct. 2831].)

 The court also properly sustained the demurrer to Fisher's 17th cause of action charging the press defendants with negligent reporting. There is no cause of action for ordinary negligence by a public official against a newspaper. (*New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254; *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323 [41 L.Ed.2d 789, 94 S.Ct. 2997].) The official must prove "actual malice" by showing either the statement was made (1) with actual knowledge it was false, or (2) with reckless disregard of whether it was false.

Fisher contends the correct rule is (or should be) that defamation flowing from ordinary negligence alone is actionable. She claims it is only the recovery of monetary damages which the foregoing cases will not allow on a showing of mere negligence. For this proposition, she posits a cause of action allowing a public official to sue for negligent defamation so long as the prayer is limited to a demand for a forced retraction. While there may be statutes authorizing such actions (see conc. opinion, Brennan, J., in *Miami Herald Publishing Co.* v. *Tornillo, supra,* 418 U.S. 241, 258 [41 L.Ed.2d 730, 741]), Fisher has not pleaded under one, and she only asks for monetary relief. We are bound by the *New York Times* v. *Sullivan, supra,* standard. (*Good Government Group of Seal Beach, Inc.* v. *Superior Court, supra,* 22 Cal.3d 672, 680.)

THE TRIAL COURT PROPERLY STRUCK IMMATERIAL
[1] ALLEGATIONS FROM THE ORIGINAL COMPLAINT

 Fisher claims the trial court improperly struck portions of certain alleged publications from her pleadings. However, two of the cited publications were never included in any causes of action and thus were never stricken, and

the trial court was within its discretion in deleting nondefamatory statements from others to exclude immaterial evidentiary matters from the complaint.[17]

Fisher relies on dicta from *Forsher* v. *Bugliosi* (1980) 26 Cal.3d 792 [163 Cal.Rptr. 628, 608 P.2d 716], for the premise the determination of whether a publication is defamatory depends on the publication taken as a whole, not extracted statements. We do not quarrel with her proposition, only her suggested application. Here, the causes of action affected by the motion to strike both withstood demurrer. Fisher was not precluded from pursuing her defamation action based on the total publications. Instead, the summary judgment motion as to these publications proceeded on alternate theories the statements were true or not made with actual malice, not on whether a defamatory meaning was conveyed. Further, Fisher used the entire text of the publications as evidence in opposing the motion for summary judgment.

## THE COURT PROPERLY DENIED FISHER'S MOTION FOR AN *In Camera* INSPECTION OF UNPUBLISHED NOTES

Copley Press initially refused a request to produce its employee's (Jacoby) unpublished notes, claiming privilege, but later produced them pursuant to court order.

Six months later Fisher again requested an order compelling production of Jacoby's documents. Copley Press submitted Jacoby's declaration stating: "I have produced all those notes in my possession or under my control. There are other matters in my notebook which have nothing to do with the Fisher matter and which this Court should not require me to produce." The court denied Fisher's motion and her request for an *in camera* inspection of Mr. Jacoby's entire notebook.

Code of Civil Procedure section 2034 pertaining to a motion to compel the production of documents leaves the decision to make an *in camera* inspection of documents to the court's discretion. The record shows no abuse of discretion here. (*Dowell* v. *Superior Court* (1956) 47 Cal.2d 483, 486 [304 P.2d 1009].)

## THE COURT DID NOT ERR IN DENYING FISHER'S MOTION TO CONTINUE THE SUMMARY JUDGMENT HEARING

On February 20, 1980, Fisher formally discharged her attorney, substituted herself, and moved for a continuance to obtain new counsel and complete

---

[17]Two of the publications pertained to the Larsen campaign defendants. Larsen's speech about Fisher's charges against superintendent Goodman was incorporated in the seventh cause of action of the original and first amended complaints. The trial court struck portions of this speech from the complaint. Larsen's news release about Fisher violating the Pupil Privacy Law was incorporated in the thirteenth cause of action of the first amended complaint. The trial court struck portions of this news release.

discovery. The trial court found the motion both untimely and without a showing of good cause.

■ Generally, power to determine when a continuance should be granted is within the discretion of the court, and there is no right to a continuance as a matter of law. (*Thurmond* v. *Superior Court* (1967) 66 Cal.2d 836, 838-840 [59 Cal.Rptr. 273, 427 P.2d 985].) However, Code of Civil Procedure section 437c mandates a continuance of a summary judgment hearing upon a good faith showing by affidavit that a continuance is needed to obtain facts essential to justify opposition to the motion. Fisher sought to justify a continuance because she desired additional discovery of the Copley Press personnel and Scott-Blair.[18]

It is not an abuse of discretion to deny a continuance to discover further evidence where the action has been pending a long time and extensive discovery has already been conducted. (*Vanderbilt Growth Fund, Inc.* v. *Superior Court* (1980) 105 Cal.App.3d 628 [164 Cal.Rptr. 621].) Here, Fisher pursued an ambitious discovery schedule for more than two years, took dozens of depositions and sent out numerous interrogatories. She had already deposed numerous Copley representatives including the publisher, editor, assistant editor, city editor, the reader's representative, the reporter of the subject articles, an employee of Copley International, a reporter for the Tribune and Scott-Blair. Although appearing without counsel, she eloquently, and at length, argued her case. Further, the court received extensive evidence by way of the exhaustive discovery already taken.

While we believe Fisher's request for continuance was not untimely, we find no good cause for the request. Her attorney was discharged because Fisher believed his efforts in pursuing discovery[19] were insufficient. There is no showing he would not have represented her at the hearing except for the discharge. His past performance reveals he was capable, and had established a good rapport with the trial court. Further, Fisher failed to show she would procure other counsel in the reasonably near future.[20]

The court in a public-figure libel case has the power to control and limit discovery. (*Herbert* v. *Lando* (1979) 441 U.S. 153, 177 [60 L.Ed.2d 115, 134, 99 S.Ct. 1635].) The trial court properly exercised its sound discretion in deny-

---

[18]She also wished to depose two superior court judges and to explore the possibility San Diego Federal Savings and Loan Association was involved in the "conspiracy" against her. However, she makes no showing this discovery was necessary to oppose the summary judgments.

[19]The record reveals the efforts of Fisher's attorney were prodigious.

[20]At oral argument, 19 months later, Fisher, who has effectively represented herself on this appeal, was still without counsel.

ing the continuance. Although Fisher had ample opportunity, she does not show how she was prejudiced by the denial of a continuance, either in her points and authorities filed after the hearing on the summary judgment motion, in her declarations in support of her motion for reconsideration of the summary judgment, or in her appellate presentations.

### THE COURT PROPERLY REFUSED TO ENTER FINDINGS OF FACT AND CONCLUSIONS OF LAW

Fisher is not entitled to findings of fact and conclusions of law on the summary judgments. (*Perry* v. *Farley Bros. Moving & Storage, Inc.* (1970) 6 Cal.App.3d 884, 889 [86 Cal.Rptr. 397].)

### THE MOTION TO AMEND AFTER SUMMARY JUDGMENT WAS PROPERLY DENIED

Fisher knew of the motions for summary judgment as early as January 6, 1981, but took no action to amend for five months. ▮ The rights to amend a complaint rest within the sound discretion of the court (*Robinson & Wilson, Inc.* v. *Stone* (1973) 35 Cal.App.3d 396, 413 [110 Cal.Rptr. 675]), and may be denied where there has been a long delay in seeking the amendment. (*Rainer* v. *Community Memorial Hosp.* (1971) 18 Cal.App.3d 240, 258 [95 Cal.Rptr. 901].) The court was within its discretion in denying the amendment.[21]

### *Disposition*

The orders sustaining demurrers are affirmed.

Summary judgments on the first and second causes of action are affirmed in favor of Edwin Gray, and reversed as to Yvonne Larsen, W. Daniel Larsen and Joseph Harmon.

Summary judgments on the sixth and ninth and causes of action are affirmed in favor of Joseph Harmon, and reversed as to Yvonne Larsen, W. Daniel Larsen and Edwin Gray.

Summary judgments on the third, fourth, fifth, seventh, tenth and eleventh causes of action are affirmed.

---

[21]Fisher also purports to appeal from a denial of her motion to reconsider the court's orders denying her continuance of the summary judgment hearings and granting the summary judgments. (Code Civ. Proc., § 1008.) However, the court actually granted her request to reconsider, read the supporting documents (which included no new facts) and with exceptional patience and courtesy listened to rambling oral argument. Only then did the court affirm its previous rulings.

Summary judgment on the eighth cause of action is reversed.

On remand the superior court shall strike the prayer for special damages from all remaining causes of action.

Wiener, Acting P. J., and Zumwalt, J.,* concurred.

Petitions for a rehearing were denied January 11, 1983, and the petitions of appellant Fisher and respondents Yvonne Larsen, W. Daniel Larsen, Harmon and Gray for a hearing by the Supreme Court were denied March 23, 1983. Mosk, J., was of the opinion that the petitions should be granted.

---

*Assigned by the Chairperson of the Judicial Council.