[Civ. No. 30062. Fourth Dist., Div. Three. May 24, 1983.]

JOSEPH R. GRILLO, Plaintiff and Appellant, v.
JOHN SMITH et al., Defendants and Respondents.

## COUNSEL

Robinson & Robinson, Mark P. Robinson, Jr., and John D. Rowell for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, Richard G. Duncan, Jr., and Robert W. Loewen for Defendants and Respondents.

## OPINION

**CROSBY, J.**—The trial court granted the defense motion for summary judgment in this action "for libel and interference with business." Plaintiff Joseph R. Grillo appeals.

Grillo was Presiding Judge of the Los Angeles Municipal Court when defendants, the corporate owner and individual publisher of the Los Angeles Times, allegedly defamed him in an article published August 7, 1976 (the Article) and an editorial published October 18, 1976 (the Editorial).[1] The complaint seeks $300,000 general damages, $50,000 special damages and $5 million punitive damages. Because the following issues are dispositive of this appeal, we do not reach other contentions of the parties:

1. Are subjective words or ambiguous syntax in a news report of a judicial proceeding sufficient to present a triable issue in a libel action against a newspaper? No.

---

[1]The full text of each publication appears in the attached appendix.

2. Is hostile editorial opinion couched in terms of factual conclusions about the conduct and motives of a high public official sufficient to raise a triable issue in a libel action against a newspaper? No.

The Article and Editorial both concerned an incident which occurred Friday, August 6, 1976. On that date Grillo's clerk, personally accompanied by the judge, served James Czarnecki, a transportation officer in the office of the Auditor of Los Angeles County, with an "Order for Issuance of Airline Transportation." The order directed Czarnecki to issue airline tickets to Grillo and two other judges who desired to travel to Sacramento to attend hearings concerning legislation related to the operation of the municipal court. When Czarnecki refused to issue the tickets under orders from his superior, Grillo personally placed him under arrest.

Czarnecki was then escorted to Grillo's courtroom, where a contempt proceeding was held despite the attempted personal intervention of the County Counsel of Los Angeles County. At the hearing itself, a deputy county counsel represented Czarnecki, who was convicted and ordered to serve two days in jail with execution stayed until the following Wednesday. Grillo said the sentence was both coercive and punitive, i.e., designed to achieve compliance with the order to provide air transportation, as well as punish Czarnecki. He indicated he would "mitigate" the punishment, provided the tickets were furnished to the other judges forthwith; he offered to buy his own.

Grillo asserts three triable issues of fact exist with respect to the Article. First, he denies he was "angry" or "shouted" or "stormed" during the colloquy with Czarnecki. Second, he objects to the "kangaroo court" description of the August 6, 1976, proceeding. Finally, he argues the statement, "There is insufficient time to go through that red tape," is out of context because it related to the mechanics of acquiring air tickets from the county auditor, not counsel's complaints concerning the failure to inform Czarnecki of his rights and afford him due process.

■ The initial determination as to whether a statement constitutes fact or opinion is one of law. (*Okun* v. *Superior Court* (1981) 29 Cal.3d 442, 450 [175 Cal.Rptr. 157, 629 P.2d 1369]; *Gregory* v. *McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 601 [131 Cal.Rptr. 641, 552 P.2d 425]; *Good Government Group of Seal Beach, Inc.* v. *Superior Court* (1978) 22 Cal.3d 673 [150 Cal.Rptr. 258, 586 P.2d 572]; *Fisher* v. *Larsen* (1982) 138 Cal.App.3d 627 [188 Cal.Rptr. 216].) ■ The words "angry," "shouted," "stormed," and "kangaroo court" fall clearly on the opinion side of the line. They are subjective words and phrases of the sort which have been found to be opinion as a matter of law frequently in the past. (*Okun* v.

*Superior Court, supra,* 29 Cal.3d 442, 459 [175 Cal.Rptr. 157, 629 P.2d 1369] (collecting examples); *Gomes* v. *Fried* (1982) 136 Cal.App.3d 924, 935 [186 Cal.Rptr. 605].)

The First and Fourteenth Amendments of the Constitution of the United States and article I, section 2 (formerly section 9) of the California Constitution confer an absolute privilege on statements of opinion concerning the conduct of public officials in office. (*Yorty* v. *Chandler* (1970) 13 Cal.App.3d 467, 473 [91 Cal.Rptr. 709].) The marketplace of ideas, not the tort system, is the means by which our society evaluates those opinions. (*Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 339-340 [41 L.Ed.2d 789, 805, 94 S.Ct. 2997].) Although offensive to Grillo, the subjective description of his actions in the conduct of judicial office contained in the Article is immune from legal attack. The reason is perhaps nowhere better expressed than in *Desert Sun Publishing Co.* v. *Superior Court* (1979) 97 Cal.App.3d 49, 51 [158 Cal.Rptr. 519]): "It is an essential part of our national heritage that an irresponsible slob can stand on a street corner and, with impunity, heap invective on all of us in public office. . . .

"Our political history reeks of unfair, intemperate, scurrilous and irresponsible charges against those in or seeking public office. Washington was called a murderer, Jefferson a blackguard, a knave and insane (Mad Tom), Henry Clay a pimp, Andrew Jackson a murderer and an adulterer, and Andrew Johnson and Ulysses Grant drunkards. Lincoln was called a half-witted usurper, a baboon, a gorilla, a ghoul. Theodore Roosevelt was castigated as a traitor to his class, and Franklin Delano Roosevelt as a traitor to his country. Dwight D. Eisenhower was charged with being a conscious agent of the Communist Conspiracy."

The Times' contention that "angry," "shouted," and "stormed," are simply not defamatory in any context may also have merit but we need look no further than the opinion-fact question to dispose of the issue. Also, it is of no significance that the phrase "kangaroo court" may be a quotation of a third party's opinion. As a third party opinion it is doubly protected: "[t]he public interest in being fully informed about controversies that often rage around sensitive issues demands that the press be afforded the freedom to report such charges without assuming responsibility for them." (*Edwards* v. *National Audubon Society, Inc.* (2d Cir. 1977) 556 F.2d 113, 120; cited with approval in *Weingarten* v. *Block* (1980) 102 Cal.App.3d 129, 148 [162 Cal.Rptr. 701].)

The argument that Grillo was libeled by the printing of an admittedly accurate quotation in an incorrect context (the "red tape" statement) was not raised in the affidavits below or in the brief filed in opposition to the

motion, except in the most general of senses. Neither is it mentioned in the complaint, which is quite specific as to the Editorial but vague and general as to the Article.[2] ■ Since defendants' affidavits were clearly adequate to establish the accuracy of the Article, it was incumbent upon plaintiff to raise a triable issue of fact by counteraffidavit to avoid the thrust of the motion.[3] (*Southern Pacific Co.* v. *Fish* (1958) 166 Cal.App.2d 353, 366 [333 P.2d 133].) This was not done with respect to the "red tape" statements.

Ordinary rules of appellate procedure might thus foreclose the raising of this point on appeal, but Grillo's belated argument lacks merit in any event. ■ A fair and true report of a judicial proceeding is privileged. (Civ. Code, § 47, subd. 4.) Thus, a fair and true report of a known falsehood concerning a private citizen uttered in a judicial proceeding is not actionable. (*Weingarten* v. *Block, supra,* 102 Cal.App.3d 129, 148.) If the object of the statement is the presiding judicial officer himself, even a report which is not fair and true will not support the imposition of liability in the absence of a showing of malice. (*Garrison* v. *Louisiana* (1964) 379 U.S. 64, 76-77 [13 L.Ed.2d 125, 133-134, 855 S.Ct. 209].) This is so because a judicial officer is a public figure as a matter of law.

The context of the "red tape" statement from the reporter's transcript is as follows: "This court does not ask for anything it did not already have. This court cannot stand shackled, to have to run to the C.A.O.'s office every time a position must be filled, every time a travel request is made. The whole reason Mr. Czarnecki is here is because there is insufficient time to go through this red tape. And the situation in question must be resolved." (J. Appen. to vol. I, pp. 73-74.) The Article stated: "When Farrell suggested Grillo had rushed the contempt without informing Czarnecki of his legal rights or affording him due process, or that Grillo might file a civil suit against the supervisors in Superior Court, Grillo stormed: 'There is insufficient time to go through that red tape.'"

The transcript of the contempt hearing supports the fact that the deputy county counsel raised the points referred to in the article; publication of his

---

[2]The reason is obvious. The complaint alleges only one retraction demand per Civil Code section 48a. Pursuant to that code section, Grillo would have been limited to special damages based on the Article, since the demand was timely filed only with respect to the editorial. Proof of special damages by defamed public officials is close to impossible. (See *Fisher* v. *Larsen, supra,* 138 Cal.App.3d 627, 635-636 and *Southwestern Publishing Co.* v. *Horsey* (9th Cir. 1956) 230 F.2d 319.)

[3]Grillo seems to suggest that the trial court had the obligation to compare the Article with the transcript of the contempt hearing to discover issues of fact which he did not think to raise. We disagree. The court is not obligated to comb the record for triable issues not raised by the parties on a motion for summary judgment. Such burdens are fortunately rare in the law. (See *People* v. *Wende* (1979) 25 Cal.3d 436 [158 Cal.Rptr. 839, 600 P.2d 1071].)

objections is obviously privileged. (*Hayward* v. *Watsonville Register-Pajaronian and Sun* (1968) 265 Cal.App.2d 255 [71 Cal.Rptr. 295]; *Williams* v. *Daily Review, Inc.* (1965) 236 Cal.App.2d 405, 418 [46 Cal.Rptr. 135].) Whether the "red tape" statement related to the alleged infringement of Czarnecki's rights *and* to the alternative of filing a civil suit or simply to the latter is too fine a distinction to be required of a publication printing "hot" news. A publication is not responsible for every strained interpretation a plaintiff might put on its words. (*Forsher* v. *Bugliosi* (1980) 26 Cal.3d 792, 803 [163 Cal.Rptr. 628, 608 P.2d 716].) In the context of the Article, the "red tape" line literally follows the subject it in fact related to when uttered, the alleged need for urgency in obtaining the tickets. Even applying the "cumulative impact" test of *Forsher* v. *Bugliosi, supra,* 26 Cal.3d 792, 804, the most that can be said is the Article implied Grillo employed harsh methods in a petty matter in the opinion of the reporter. That opinion required no basis in fact, as we discussed previously. And, unfortunately, it appears there was plenty to support it.[4]

We now turn to the Editorial, apparently the real target of Grillo's suit. (See fn. 3, *ante.*) First, it should be common knowledge to the average reader that the editorial page is the traditional location of a publication's opinions and frequently the conflicting opinions of others. It is typically devoted to a discussion of ideas, not the transmission of news. For example, one representative definition of the word editorial is: "[E]xpressive of an opinion . . . a newspaper or periodical article that is usu[ally] given a special or significant place and that intentionally expresses the views of those in charge of the publication on a matter of current interest; *also,* an expression of opinion that resembles such an article." Webster's Third New International Dictionary (1967).

Nevertheless, Grillo culls five alleged factual misstatements from the Editorial, which he contends raise triable issues: (1) he "swept into the man's office, cited him for contempt, sentenced him to jail and harangued about separation of powers"; (2) he issued an "illegal court order"; (3) he "wanted the taxpayers to pay his way on a lobbying trip"; (4) he "commandeered the rights of an innocent man and embarked on an odyssey far outside his

---

[4]We are not impressed with the often disingenuous affidavit filed by Grillo in opposition to the motion for summary judgment. There, for example, he states he never intended to actually jail Czarnecki, contrary to his statement at the hearing itself that the contempt sentence was both punitive and coercive. He also claims that a San Bernardino civil proceeding against the County of Los Angeles, which confirmed his right to the tickets, somehow vindicated the manner in which he originally attempted to obtain them, an obvious non sequitur.

court's authority"; and (5) he later "changed his mind under pressure from his peers."

A newspaper is perfectly free to opine that court orders are illegal and to criticize judges for violating the rights of innocent persons and exceeding their authority. There is no requirement that opinion and criticism of that sort have any legal or factual basis whatsoever. (*Desert Sun Publishing Co.* v. *Superior Court, supra,* 97 Cal.App.3d 49, 52; *Baumgartner* v. *United States* (1944) 322 U.S. 665, 674 [88 L.Ed. 1525, 1531, 64 S.Ct. 1240].) The second and fourth items listed above are nothing more than the subjective opinions of the Times concerning the conduct in office of a public official; they are absolutely protected under the First Amendment.

It is often said the context can determine whether a statement constitutes fact or opinion. (*Good Government Group of Seal Beach, Inc.* v. *Superior Court, supra,* 22 Cal.3d 672, 680.) While the three remaining statements might be considered assertions of fact rather than expressions of opinion in some contexts, a newspaper editorial criticizing the official actions of the presiding judge of the largest municipal court in the state (if not the country), particularly concerning the application of harsh judicial remedies to administrative trivia, is not one of them. Such a "publication may not be dissected and judged word for word or phrase by phrase. The entire publication must be examined." (*Desert Sun Publishing Co.* v. *Superior Court, supra,* 97 Cal.App.3d 49, 52.) The statements that the judge "swept into a man's office," etc., "wanted the taxpayers to pay his way on a lobbying trip," and "changed his mind under pressure from his peers" not only appear to be substantially accurate on this record, in the editorial context they merely express the Times' opinion of what his actions and motivations were. As such they constitute nothing "more than a constitutionally protected expression of severe disapproval of noncriminal conduct." (*Okun* v. *Superior Court, supra,* 29 Cal.3d 442, 459-460.)

In light of the unique censure of his action by the Los Angeles County Bar Association, the event which triggered the Editorial, it is surprising that a man trained in the law would not reconsider rather than compound the matter. Our highest court has repeatedly reminded the judiciary that fragile First Amendment freedoms can be threatened by litigation itself, though no recovery is ever had. (*Good Government Group of Seal Beach, Inc.* v. *Superior Court, supra,* 22 Cal.3d 672, 685; *Kaufman* v. *Fidelity Fed. Sav. & Loan Ass'n.* (1983) 140 Cal.App.3d 913 [189 Cal.Rptr. 818].) Grillo's pursuit of this ill-advised suit does no credit to his former office and suggests his judgment still remains distorted by a festering personal pique concerning this 1976 administrative triviality. Defendants shall recover costs on appeal.

Judgment affirmed.

Trotter, P. J., and Wallin, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 10, 1983.

---

APPENDIX

## BIZARRE SESSION OVER AIRLINE TICKETS *Aug. 7, 1976*

# Judge Arrests, Sentences County Aide

**BY MYRNA OLIVER**
Times Staff Writer

Los Angeles Municipal Court presiding Judge Joseph R. Grillo arrested a county transportation officer Friday, held him in contempt and sentenced him to two days in county jail because the man refused to issue two judges airline tickets to Sacramento worth $53.

Grillo then stayed the incarceration of James Czarnecki, transportation manager in the office of county Auditor Mark Bloodgood, until Wednesday. Grillo said he acted out of "compassion.

In putting off the jail term, Grillo said, "Part of being a judge is compassion . . . . so I will stay this sentence."

The judge said he was "going to be in Sacramento Monday. I'll stay it (the sentence) until noon Wednesday."

County Counsel John L. Larson—infuriated by the impromptu court session in which Grillo acted as plaintiff, his own attorney, and judge—already had moved to appeal to the Superior Court Appellate Department. A hearing on that appeal of Grillo's unprecedented contempt order was tentatively scheduled for Tuesday.

"It shook me up a little," Czarnecki admitted as he walked, temporarily

James Czarnecki

Judge Joseph R. Grillo
Times photos

free, from the courtroom after contemplating a possible weekend in jail.

The bizarre courtroom scene was set by the angry Grillo when he himself and Municipal Judges James Di Giuseppe and Peter Katsufrakis to lobby at legislative committee meetings Monday and Tuesday in Sacramento.

Katsufrakis' ticket was later approved, Czarnecki said, so that the judge could discuss Small Claims Court legislation. The judge presides over the Los Angeles court's small claims division.

But County Administrative Officer Harry L. Hufford's office refused to

Please Turn to Page 21, Col. 3

# JUDGE ARRESTS, SENTENCES MAN

Continued from First Page

approve the tickets for Grillo and Di Giuseppe because they wanted to lobby for a bill appropriating six more judges for the Los Angeles Municipal Court. The Board of Supervisors earlier this week voted to recommend against expanding the court. But the measure is still technically alive in Sacramento.

"The obvious reason was it would look rather ridiculous for the board to finance somebody to go up and lobby for something it had turned down," Bloodgood told The Times during a break in the proceedings.

Czarnecki, on Bloodgood's orders, refused to issue the two tickets without the necessary approval or a personal check from the judges.

Grillo wrote a formal court order commanding Czarnecki to issue the tickets and marched across the County Mall to give it to the transportation agent. Grillo was accompanied by his bailiff, Dep. Marshall Harry Grosdidier; his administrative assistant, Robert Clifford, and the court's chief administrative officer, George Shannon, who later testified under Grillo's personal interrogation that the court budget allows 12 trips to Sacramento and only one has been used this year.

Grillo personally arrested Czarnecki and marched him back to his own courtroom, where Grillo normally assigns civil cases to court.

Dep. County Counsel John P. Farrell was hastily summoned to defend Czarnecki in what legal observers likened to a kangaroo court. Farrell's boss, County Counsel Larson, was not far behind.

Larson stormed through the courtroom prior to the session and entered Grillo's chambers, shouting that the county counsel's office (which normally represents judges as well as county officers) would not serve as Grillo's lawyer.

"You didn't knock," Grillo chided him.

The county counsel invited Grillo to arrest him or Bloodgood, who also prowled the courtroom during the circus-like afternoon. Grillo refused, and Larson left the chambers describing the judge in obscenities.

Supervisor Kenneth Hahn immediately issued a statement saying Grillo should have arrested Administrative Officer Hufford, who had denied approval for the tickets.

In the bizarre court proceeding, Dep. County Counsel Farrell tried vainly to argue that Grillo's contempt order was invalid because it did not stem from any courtroom proceeding and that Grillo had no jurisdiction to issue it.

Grillo saw the whole thing as a separation-of-powers crisis.

"This is exactly what we are trying here," Grillo shouted. "Is the presiding judge going to run the court or is the CAO going to run the court? . . . Who shall execute its budget—the manager of the organization or the auditors? This court cannot stand shackled or run to the CAO every time a position must be filled or transportation is needed."

When Farrell suggested Grillo had rushed the contempt without informing Czarnecki of his legal rights or affording him due process, or that Grillo might file a civil suit against

the supervisors in Superior Court, Grillo stormed:

"There is insufficient time to go through that red tape!"

During the proceedings, Grillo continually "bargained" with Farrell, saying he would dissolve the contempt or mitigate the sentence if Czarnecki would issue a ticket for De Giuseppe. Grillo said he would personally pay for his own flight.

Grillo refused to disqualify himself.

"This contempt was committed in my presence as a result of my order," Grillo told Farrell. "I have discussed this with you most impersonally. If your statements are construed to mean this court is prejudiced, your statements are stricken. I will not relegate this responsibility to some other judge!"

Grillo repeatedly denied any personal involvement in the case. He said he was merely asserting the court's rights on behalf of all its judges.

**Los Angeles Times**

HARRISON GRAY OTIS, 1882-1917
HARRY CHANDLER, 1917-1944
NORMAN CHANDLER, 1944-1960

OTIS CHANDLER, Publisher

ROBERT D. NELSON
Executive Vice President and General Manager
WILLIAM F THOMAS
Executive Vice President and Editor

CHARLES C CHASE, Vice President—Production
ROBERT L FLANNES, Vice President and Assistant to the Publisher
ROBERT C. LOBDELL, Vice President and General Counsel
VANCE L. STICKELL, Vice President—Sales

JAMES BASSETT, Associate Editor
ANTHONY DAY, Editor of the Editorial Pages
ROBERT J. DONOVAN, Associate Editor
FRANK P HAVEN, Managing Editor
JEAN SHARLEY TAYLOR, Associate Editor

6 10R—Part II     MONDAY MORNING, OCTOBER 18, 1976

# Bailing Out the Water Plan

The California Department of Water Resources has produced a water development plan that points the state in the right direction.

With a multibillion-dollar investment in additional canals and reservoirs, the state could extend secure water delivery to important areas that have been denied a fair share of the benefits of existing systems.

But that achievement will depend on a compromise of some of the outstanding water disputes, and there is no agreement yet.

Nowhere is a compromise more elusive than in the delta of the Sacramento and San Joaquin Rivers, the source of its own bounty in fisheries and reclaimed farmland, and the center of the $7 billion system that feeds fields and cities to the south through the California Water Project and the Central Valley Project.

The inability of state and federal officials to agree on the appropriate flow for delta consumers themselves has frustrated further development of water for the farms of the San Joaquin Valley. So great is the suspicion of the delta interests that no contract, no guarantee of water flow appears likely to win their support for the peripheral canal.

And yet it is more evident now than ever that this canal, a 42-mile crescent around the eastern margins of the delta, is essential to all the users. For it can enhance the water quality in the delta just as it can assure more flow southward.

It is encouraging that the Department of Water Resources has taken that into account in its new blueprint. But the department's plan is immediately placed in doubt by its talk of constructing only part of the peripheral canal, not because partial construction would serve anyone better or even cost less, but because it would reassure the anxieties of the delta interests.

It is also encouraging that the state now seems determined to work out, with congressional support, a compromise in its confrontation with the U.S. Bureau of Reclamation. There obviously are competing claims between the state's California Water Project and the bureau's Central Valley Project. At the same time, it is evident that each needs the cooperation of the other if both are to succeed. Yet the political reality in Washington is such that no legislative accord is going to emerge unless it takes due account of the bureau's determination to get more water to the farms of the San Joaquin Valley.

Of particular importance in the new state proposal is the balance in it. The plan recognizes that water supply is finite. It urges restraint: some new reservoirs, but not some of the wild rivers of the north. Yet it does not bow to those who would do nothing, thus recognizing the risk of a paralysis of development in a world that is hungry for more food, and a state and a nation that are eager for more employment.

What must come now, if this is to mean much, are the hard decisions on how the finite resource is to be shared among the people. The water is not the possession of a federal bureau or a state bureaucracy but a public property, to be used for the public good. Much of history, however, is the story of how difficult it is to define that good and divide that resource.

# A Judge Learns About Justice

For the first time in its history, the trustees of the Los Angeles County Bar Assn. have publicly censured a judge and urged the California Commission on Judicial Qualifications to review the jurist's conduct.

The censure is unfortunately apt. The judge is Joseph R. Grillo, the presiding judge of Los Angeles Municipal Court.

Last August, Grillo commandeered the rights of an innocent man and embarked on an odyssey far outside his court's authority. Deciding that he wanted the county taxpayers to pay his way on a lobbying trip to Sacramento, Grillo issued an illegal court order demanding air tickets. When a county employe demurred, Grillo swept into the man's office, cited him for contempt, sentenced him to jail and harangued about separation of powers.

Grillo later changed his mind under pressure from peers, but his annulment of the court order and the sentence was as sloppy as his treatment of defendant rights; it took a three-judge panel to unravel the mess.

Grillo's fellow Municipal Court judges sadly failed to disavow his shoddy mockery of justice, and so it was left to the Bar to uphold higher standards. The censure was necessary. So is commission review of Grillo's errant conduct.