KILCOYNE, Appellant,

v.

PLAIN DEALER PUBLISHING COMPANY et al., Appellees.

[Cite as *Kilcoyne v. Plain Dealer Publishing Co.* (1996), 112 Ohio App.3d 229.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

Nos. 68648, 69345.

Decided May 28, 1996.

230

*Don C. Iler,* for appellant.

*Baker & Hostetler, Louis A. Colombo, Michael K. Farrell* and *Randy Solomon,* for appellees.

---

KARPINSKI, Judge.

This case arises from media commentary on a series of legal proceedings involving a judge upon his acquittal of five felony charges. The case presents a textbook conflict between claims of defamatory harm to reputation and the principles of free speech and debate on public issues. For the following reasons, we affirm the trial court's grant of summary judgment and dismissal of the remaining tort claims.

Plaintiff-appellant James Kilcoyne, a former Cuyahoga County Common Pleas judge, filed this case in the common pleas court on September 18, 1992, against the Plain Dealer, the Plain Dealer Publishing Company, editorial page director Brent Larkin, and columnist Joe Dirck. Kilcoyne's complaint arose from a series of two editorials and three opinion columns published within weeks of his acquittal on five felony charges filed while he held public office as a judge.

This saga began in the early morning hours of October 6, 1987, when Kilcoyne was injured as the car he was driving collided with a stationary vehicle on the shoreway. Kilcoyne admitted consuming alcohol prior to the collision. The exact amount and effect of his alcohol consumption were disputed and he was never charged with operating his motor vehicle while under the influence of alcohol. He subsequently recovered a $100,000 settlement from the insurer of the other vehicle and $908,750 from his own insurance carrier in a civil arbitration. Kilcoyne was ultimately indicted in September 1990, on five felony charges arising out of his insurance claims, including tampering with evidence, perjury, grand theft, aggravated grand theft, and falsification.

These events were the subject of numerous news accounts and commentaries. Of twenty-nine Plain Dealer articles concerning him, five commentaries published after his acquittal on the criminal charges were challenged in the complaint.[1] The five commentaries, reproduced in their entirety in the Appendix, were sharply critical of Kilcoyne, another judge, and several other lawyers in addition to the judicial system generally and in this particular matter. Kilcoyne's complaint raised claims for libel, intentional infliction of emotional distress, false light invasion of privacy, and negligent defamation.

---

1.  Of the twenty-four Plain Dealer news articles concerning Kilcoyne, twenty were published after the accident, eighteen related to the criminal charges against him, and six concerned his failure as a judge to provide speedy trials to criminal defendants because of the backlog of his docket.

Defendants filed a joint answer denying the substantive allegations of Kilcoyne's complaint. Citing failure to state a claim upon which relief could be granted, defendants thereafter filed a motion to dismiss Kilcoyne's allegations of false light and negligent defamation. Over Kilcoyne's opposition, the trial court granted defendants' motion to dismiss the two claims.

After extensive discovery over the ensuing two-year period, defendants filed a joint motion for summary judgment on Kilcoyne's remaining libel and emotional distress claims. Subsequent to the filing of a brief in opposition and a reply brief, the trial court granted defendants' motion for summary judgment.

Kilcoyne thereafter filed a motion to vacate judgment and for reconsideration in the trial court, as well as a notice of appeal in court of appeals case No. 68648. This court of appeals granted Kilcoyne's motion to remand the cause to the trial court to adjudicate his pending motion to vacate. The trial court subsequently granted Kilcoyne's motion to vacate, but reentered summary judgment for defendants. Kilcoyne filed a second notice of appeal in court of appeals case No. 69345. This court of appeals consolidated the two appeals for hearing and disposition. Kilcoyne raises four assignments of error in these consolidated appeals.

## I

Kilcoyne's first assignment of error challenges the trial court's order granting summary judgment against him on his libel claim as follows:

"The trial court erred in granting summary judgment where defendants were not entitled to judgment as a matter of law and genuine issues of material fact remained concerning the defendants' actual malice and the provable falsehood of defendants' defamatory statements."

Kilcoyne's first assignment of error lacks merit.

Kilcoyne argues that the trial court improperly granted summary judgment against him because he presented evidence that defendants made false defamatory statements in the five challenged articles with a reckless disregard for the truth of the statements. Kilcoyne argues that the statements in these columns and editorials do not constitute constitutionally protected "opinions" or "rhetorical hyperbole" and that he produced sufficient evidence defendants published them with "actual malice."

Kilcoyne's wide-ranging substantive claims are summarized in the introduction to his brief on appeal as follows:

"Defendants launched a sustained attack against plaintiff's character and repeatedly accused him of illegally enriching himself by lying, abusing the legal

system, and engaging in other improper, unlawful, shameful, and criminal conduct. The plain meaning and clear implication of defendants' false statements was that Judge Kilcoyne deserved to be imprisoned because he was really a criminal (despite his having been exonerated), that he was a thief and a liar, that he was an habitual drunk, that his extreme intoxication was the cause of the accident of October 6, 1987, and that he also drank on the bench. Defendants stated, or implied by innuendo, that Judge Kilcoyne was sexually dissolute and immoral, and that he was grossly derelict in his duties as judge. The defendants characterized Judge Kilcoyne as a 'miscreant,' incompetent, 'despicable,' 'seedy,' 'sordid'—in short, 'a bum.' Defendants stated and insinuated that Judge Kilcoyne lied and even perjured himself, destroyed evidence, and 'abused the hell out of the system' in a conspiracy to obstruct justice, to escape prison, and to defraud insurance companies of a million dollars in connection with his accident, by means of a collusive and criminal scheme."

## A

■ Since the landmark case of *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, public figure plaintiffs who bring defamation suits for harm to their reputation face constitutional limitations. These limitations are based on "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* at 270, 84 S.Ct. at 721, 11 L.Ed.2d at 701. See, also, *Driscoll v. Block* (1965), 3 Ohio App.2d 351, 359, 32 O.O.2d 506, 511, 210 N.E.2d 899, 904–905. These words aptly cover the Plain Dealer articles.

The Supreme Court has repeatedly recognized the historical role of the press in scrutinizing the conduct of public officials. In *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 344–345, 94 S.Ct. 2997, 3009–3010, 41 L.Ed.2d 789, 808, the court stated in pertinent part as follows:

"[T]here is a compelling normative consideration underlying the distinction between public and private defamation plaintiffs. An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case. And society's interest in the officers of government is not strictly limited to the formal discharge of official duties. As the Court pointed out in *Garrison v. Louisiana* [1964], 379 U.S. [64], at 77 [85 S.Ct. 209, at 217, 13 L.Ed.2d 125, 134], the public's interest extends to 'anything which might touch on an official's fitness for office. * * * Few personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motiva-

tion, even though these characteristics may also affect the official's private character.' "

The Supreme Court has specifically noted in this context that "charge[s] of criminal conduct, no matter how remote in time or place, can never be irrelevant to an official's or a candidate's fitness for office for purposes of application of the 'knowing falsehood or reckless disregard' rule of *New York Times* * * *." *Monitor Patriot Co. v. Roy* (1971), 401 U.S. 265, 277, 91 S.Ct. 621, 628, 28 L.Ed.2d 35, 44; *Dupler v. Mansfield Journal Co.* (1980), 64 Ohio St.2d 116, 118–119, 18 O.O.3d 354, 355–356, 413 N.E.2d 1187, 1189, fn. 1; *Harris v. Plain Dealer Publishing Co.* (1988), 40 Ohio App.3d 127, 128, 532 N.E.2d 192, 194.

Courts have recognized that media coverage of judicial proceedings serves the dual purpose of scrutinizing judicial officials and ensuring the proper administration of justice:

" 'It is desireable that the trial of causes should take place under the public eye, not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under a sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed.' " *State ex rel. The Repository v. Unger* (1986), 28 Ohio St.3d 418, 424, 28 OBR 472, 477, 504 N.E.2d 37, 42 (Celebrezze, C.J., concurring, quoting Justice Holmes in *Cowley v. Pulsifer* [1884], 137 Mass. 392, 394).

Simply put, criticism by the press is an occupational hazard for judges, who "are supposed to be men of fortitude, able to thrive in a hardy climate." *Craig v. Harney* (1947), 331 U.S. 367, 376, 67 S.Ct. 1249, 1255, 91 L.Ed. 1546, 1552; *Driscoll v. Block*, 3 Ohio App.2d at 360, 32 O.O.2d at 511–512, 210 N.E.2d at 905. This matter provided especially fertile ground for press coverage and comment concerning the judicial system because Kilcoyne occupied multiple roles in the litigation process: judge, criminal defendant, and civil plaintiff. Moreover, once the litigation was completed, it provided a unique opportunity to consider the effect of the litigation on his fitness for office.

The Ohio Supreme Court has recently stated that Section 11, Article I of the Ohio Constitution provides broader protection for media commentary than does the First Amendment to the United States Constitution. The court recognized a specific privilege for statements of "opinion" in *Vail v. Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 281, 649 N.E.2d 182, 184–185 (distinguishing *Milkovich v. Lorain Journal Co.* [1990], 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1, which declined to recognize protection for "opinions" under the First Amendment). In the case at bar, the five challenged editorials and commentary columns are composed almost entirely of opinions evaluating completed legal proceedings,

lawyers, and the judicial system. These statements, therefore, fall under the privilege set forth in *Vail*.

A unifying theme of the five challenged articles is their criticism of legal proceedings and participants, including the appropriateness of Kilcoyne's acquittal on the felony charges and substantial recovery on his civil claims. The articles question whether the legal system lived up to its ideal of providing equal justice under the law or whether Kilcoyne received special favorable treatment. Each article reported that Kilcoyne was exonerated of the criminal charges, but commented that the underlying events implicated his fitness for office and ability to serve as a judge. These ideas are near the core of the kind of speech protected by the Constitution, and we reject Kilcoyne's request to impose liability for them.

Other matters covered in the five challenged articles are also constitutionally protected. Larkin's September 22, 1991 article added criticism of Kilcoyne for collecting a salary while he performed no public services during the pendency of the criminal charges. This article also observed that Kilcoyne's docket backlog resulted in the denial of speedy criminal trials. Dirck's October 1, 1991 commentary questioned the criminal trial court's exclusion of evidence about Kilcoyne's use of alcohol and discussed the potential effect of alcohol use on Kilcoyne's judicial performance. The following day, an editorial calling for Kilcoyne's removal from office reported that this episode continued to impair Kilcoyne's performance as a judge because the administrative judge found it necessary to remove him from a drunk driving case. Dirck's October 8, 1991 commentary, which criticized lawyers and the legal system, focused primarily on two lawyers not related to the Kilcoyne matter. The remaining article, the October 20, 1991 editorial, reported that the Ohio Supreme Court was investigating Kilcoyne and another judge and called for the removal of both judges from office. The expression of these ideas is likewise constitutionally protected.

Kilcoyne takes particular offense to specific words used in the five editorials and columns: "miscreant," "despicable," "seedy," "sordid," and "bum." Use of such epithets, however, has long been recognized as constitutionally protected speech, regardless of whether they are classified as "opinion" or "rhetorical hyperbole":

"It is an essential part of our national heritage that an irresponsible slob can stand on a street corner and, with impunity, heap invective on all of us in public office.

"  *  *  *

"Our political history reeks of unfair, intemperate, scurrilous and irresponsible charges against those in or seeking public office. Washington was called a

murderer, Jefferson a blackguard, a knave and insane (Mad Tom), Henry Clay a pimp, Andrew Jackson a murderer and an adulterer, and Andrew Johnson and Ulysses Grant drunkards. Lincoln was called a half-witted usurper, a baboon, a gorilla, a ghoul. Theodore Roosevelt was castigated as a traitor to his class, and Franklin Delano Roosevelt as a traitor to his country. Dwight D. Eisenhower was charged with being a conscious agent of the Communist conspiracy." *Grillo v. Smith* (1983), 144 Cal.App.3d 868, 872, 193 Cal.Rptr. 414, 417.

The Supreme Court has classified such epithets as constitutionally protected "rhetorical hyperbole" or "imaginative speech." *Milkovich v. Lorain Journal Co.*, 497 U.S. at 20, 110 S.Ct. at 2706, 111 L.Ed.2d at 19. The language in this case pales in comparison to that found to be protected in other cases. See *Vail v. Plain Dealer Publishing Co.*, 72 Ohio St.3d 279, 649 N.E.2d 182 ("gay-basher," "neo-numbskull," "anti-homosexual diatribe," "hate-mongering," and "bigot"); *Stepien v. Franklin* (1988), 39 Ohio App.3d 47, 528 N.E.2d 1324 ("stupid," "dumb," "buffoon," "nincompoop," "scum," "a cancer," "an obscenity," "gutless liar," "unmitigated liar," "pathological liar," "egomaniac," "nuts," "crazy," "irrational," and "lunatic").

Based on our independent review of the totality of the circumstances, including the context in which the editorial and commentary statements appear, the full context of each article, and the specific normative language used, and because the opinions are not capable of being proven true or false, we conclude that Kilcoyne has failed to show that the trial court erred in granting summary judgment against him as a matter of law. Each of the statements can be classified under one or more of the following constitutionally protected forms of speech: (1) statements of opinion, (2) hyperbole or imaginative expression which could not reasonably be interpreted as stating facts about the plaintiff, or (3) substantially true, fair and accurate reports of judicial proceedings. None of the statements challenged by Kilcoyne, therefore, warrants recovery for defamation as a matter of law. Nor does the remainder of the five articles, individually or cumulatively.

## B

Finally, even if the publications were not constitutionally protected speech as Kilcoyne contends, summary judgment was warranted because Kilcoyne failed to sufficiently demonstrate actual malice as a matter of law. It is well established that to defeat a motion for summary judgment in a libel case, a plaintiff who is a public official must produce evidence sufficient to raise a genuine issue of material fact from which a reasonable jury could find actual malice with convincing clarity. *Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202; *Perez v. Scripps–Howard Broadcasting Co.* (1988), 35 Ohio St.3d

215, 218, 520 N.E.2d 198, 201–202; *Harris v. Plain Dealer Publishing Co.*, 40 Ohio App.3d 127, 532 N.E.2d 192.

Based on our independent review of the record, we conclude that Kilcoyne has failed to produce evidence to satisfy this standard. Kilcoyne contends that he produced sufficient evidence of "actual malice" because defendants failed to investigate fully all the litigation involving him, did not comply with their own standards, used hostile sources, bore ill will, and slanted the publications against him. However, these claims, whether considered individually or cumulatively, do not support a finding of "actual malice."

■ The term "actual malice" in a libel suit concerns the publisher's attitude toward the truth rather than toward the plaintiff. To show "actual malice," the plaintiff must show that the publisher either knew the defamatory publication was false or issued the publication with a reckless disregard for the truth. Contrary to Kilcoyne's argument, the record in this case does not show that defendants published any statements either with knowledge that they were false or with a reckless disregard to whether they were false, or that defendants knowingly or recklessly disregarded any false implications in the publications.

Kilcoyne's argument boils down to a claim that defendants acted with "actual malice" because the five editorials and columns went beyond reporting the "truth" as found by the trial judge in the criminal case. This argument, however, ignores that the press has a right to examine critically both legal proceedings and the results of the proceedings. A judicial proceeding resolves a dispute among the parties, but does not establish absolutely the "truth" for all time and all purposes. Furthermore, to state that legal proceedings were unjust or reached the wrong result is an opinion not capable of being proven true or false and is constitutionally protected.

■ The law does not require newspapers to be "fair" or to balance their reporting, nor can this court be guided by such criteria. These are requirements by which readers and Pulitzer juries, not the law, judge the press. Lack of fairness or balance in a newspaper article simply does not establish "actual malice." The court in *Westmoreland v. CBS, Inc.* (S.D.N.Y.1984), 601 F.Supp. 66, persuasively rejected this claim in the context of a television broadcast, stating as follows:

"The fairness of the broadcast is not at issue in the libel suit. Publishers and reporters do not commit a libel in a public figure case by publishing unfair one-sided attacks. The issue in the libel suit is whether the publisher recklessly or knowingly published false material. The fact that a commentary is one sided and sets forth categorical accusations has no tendency to prove that the publisher believed it to be false. The libel law does not require the publisher to grant his

accused equal time or fair reply. * * * A publisher who honestly believes in the truth of his accusations (and can point to a non-reckless basis for his beliefs) is under no obligation under the libel law to treat the subject of his accusations fairly or evenhandedly." *Id.* at 68.

Finally, even if Kilcoyne presented some evidence of "actual malice" as he contends, summary judgment was warranted because the evidence does not satisfy the rigorous constitutional standard of proof by "clear and convincing" evidence. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202. The evidence purporting to establish "actual malice" in this case stems from a conflict between how each party interpreted or emphasized events during the trial proceedings and the weight each gave to the evidence. Under no stretch of the imagination is the evidence "clear and convincing" that defendants knew that their version was false or had a high degree of awareness of its probable falsity, especially since their version was supported by evidence, testimony under oath, and official court records.

Accordingly, Kilcoyne's first assignment of error is overruled.

## II

Kilcoyne's second and third assignments of error challenge the dismissal of his false light invasion of privacy and negligent defamation claims as follows:

"The trial court erred in granting defendants' Civ.R. 12(B)(6) motion to dismiss plaintiff's claim under the theory of false light invasion of privacy.

"The trial court erred in dismissing plaintiff's claim of negligent defamation and in determining that plaintiff was a public official even with respect to matters involving only his private life unconnected to his public service as a judge."

Kilcoyne's second and third assignments of error lack merit.

Kilcoyne argues that the trial court improperly dismissed counts three and four of his complaint for failure to state a claim upon which relief could be granted. In these counts Kilcoyne alleged false light invasion of privacy and negligent defamation.

As noted above, in *Vail v. Plain Dealer Publishing Co.,* 72 Ohio St.3d 279, 649 N.E.2d 182, the Ohio Supreme Court recently affirmed the dismissal of a claim in a defamation action. The court held that claims should not be dismissed under Civ.R. 12(B)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Id.* at 280, 649 N.E.2d at 184.

The Ohio Supreme Court has never recognized a cause of action for false light invasion of privacy. The court has again recently declined to recognize this tort.

*M.J. DiCorpo, Inc. v. Sweeney* (1994), 69 Ohio St.3d 497, 507, 634 N.E.2d 203, 210 (citing *Yeager v. Local Union 20* [1983], 6 Ohio St.3d 369, 372, 6 OBR 421, 423–424, 453 N.E.2d 666, 669–670). Absent an authoritative pronouncement from the Ohio Supreme Court, we likewise decline to recognize this tort, and, accordingly, affirm the judgment of the trial court dismissing this claim.

■ Kilcoyne's claim for negligent defamation was likewise properly dismissed because his complaint unambiguously reveals that he was a public official or figure. Public officials or figures are required to establish "actual malice" rather than "negligence" to support defamation claims. Kilcoyne's complaint specifically alleged that he was a judge at the time defendants published the two editorials and three columns attached to the complaint. Among the allegations in Kilcoyne's complaint, paragraph 19 states as follows:

"Said article falsely accused Plaintiff of failing to perform his judicial duties and other wrongful conduct as a judge."

Since judges are public officials, the "actual malice" standard of *New York Times* applies to them regarding comments on matters "which might touch on an official's fitness for office," including past criminal charges. This court has previously held in this precise context that when a public official claims that statements published about his private life were defamatory, he must prove by clear and convincing evidence that the statements were made with actual malice. *Harris v. Plain Dealer Publishing Co.*, 40 Ohio App.3d 127, 532 N.E.2d 192.[2]

Accordingly, Kilcoyne's second and third assignments of error are overruled.

### III

Kilcoyne's fourth assignment of error follows:

"The judgment of February 6, 1995 was void, because the trial judge lacked jurisdiction to act as a common pleas court judge after he had already assumed the duties of Ohio Inspector General."

Kilcoyne's fourth assignment of error lacks merit.

Kilcoyne contends that summary judgment on his libel and emotional distress claims was void because the trial judge was appointed as the Ohio Inspector

---

2. Kilcoyne contends that he was not a public official or person for all purposes and in all contexts. Even if this argument were true, his complaint unambiguously indicates that he was a "public figure" for the range of issues involved in this case. At a minimum, Kilcoyne became a public figure in this matter after he initiated or was drawn into a public controversy as a party in the civil and criminal proceedings upon which the challenged articles were based. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789.

General on the same day that the initial order granting summary judgment for defendants was journalized.

■ The record shows that the original order of the trial judge granting summary judgment for defendants was journalized on February 6, 1995. The trial judge was appointed to the office of Inspector General in a document executed by the Governor the same day. Although the two documents bear the same effective date, the record does not show which of the two documents became effective first. As a result, Kilcoyne has failed to show that the trial judge occupied the office of Inspector General before lawfully entering judgment against him.

■ In any event, even if the trial court lacked authority to enter the February 6, 1995 summary judgment order as Kilcoyne contends, the record shows that any defect has already been cured. Cf. *Barksdale v. Van's Auto Sales, Inc.* (1989), 62 Ohio App.3d 724, 730–731, 577 N.E.2d 426, 430–431. The trial judge vacated his February 6, 1995 order during the course of appeal following remand from this court and reentered summary judgment on July 5, 1995, when he no longer held office as Inspector General. Because the trial judge properly granted summary judgment for defendants on the merits as discussed in Section I above, Kilcoyne has failed to show any prejudice.

Accordingly, Kilcoyne's fourth assignment of error is overruled.

*Judgment affirmed.*

NAHRA, P.J., and TIMOTHY E. MCMONAGLE, J., concur.

# APPENDIX

SUNDAY, SEPTEMBER 22, 1991

BRENT LARKIN

# A bum — a rich bum

To be a bum, one needn't be a felon.
For proof, look no further than last week, when visiting Judge Robert Ford exonerated Cuyahoga County Common Pleas Court Judge James F. Kilcoyne on a bundle of felony counts, including grand theft, perjury and tampering with evidence.

Now we know. Kilcoyne wasn't found to be a felon.

But he's still a bum.

He's a bum because he abused the hell out of the system. He's a bum because he took more than $1 million from two insurance companies after a 1987 automobile accident.

In fact, Kilcoyne showed his seedy side by having the gall to even ask to be compensated for his injuries. He had no one to blame but himself when he smashed into a stalled car.

Worse yet, Kilcoyne obtained the automobile insurance from one of the firms he collected on by telling the insurance company he hadn't been in an accident in 25 years, even though his coverage had been canceled by his previous insurer because of too many accidents.

And Kilcoyne is a bum because he has hardly worked since October of 1987 but has still collected about $80,000 a year in salary, courtesy of the taxpayers. You see, the judge — and I use that term loosely — has had hip problems ever since he rammed into that stalled car in the accident that, incredibly, made him a millionaire.

In fairness, Kilcoyne had a lot of help in the shameful process that netted him $1 million.

*Should Kilcoyne have the gall to seek re-election in 1994, he can kiss his job goodbye. Pee Wee Herman could beat this loser.*

He had a three-member arbitration panel that was shown that Kilcoyne's blood alcohol content was 0.22% shortly after the accident. A reading of 0.10% is legal proof of intoxication, but this trio chose to reject the test findings because Kilcoyne said he was sober. These three clowns believed this lousy judge over an accepted and reliable testing procedure. Then, they actually awarded Kilcoyne more money than he even asked for.

And, of course, the hospital chart that showed Kilcoyne was smashed at the time of the accident has since conveniently disappeared.

As for Continental Insurance Co., which paid the vast majority of the $1 million "awarded" the judge? It just so happens that Edward Cass, the lawyer who represented Continental in Kilcoyne's claim against the company, told a Plain Dealer reporter a year ago that Kilcoyne was his friend. Cass also served as co-counsel on several other legal cases with Anthony O. Calabrese Jr., Kilcoyne's lawyer in the $1 million action and now a Common Pleas judge.

If you think the public believes this one was on the up-and-up, you're living in a dream world. The prosecution may not have been able to prove its case against Kilcoyne in the courtroom, but in the court of public opinion Kilcoyne has deservedly been handed a life sentence.

Should Kilcoyne have the gall to seek re-election in 1994, he can kiss his job goodbye. Pee Wee Herman could beat this loser.

Kilcoyne beat the rap because he had a good lawyer, Gerald Messerman, and because the charges against him were so difficult to prove. Even Judge Ford seemed to be saying something when he said he would have liked to have the option of finding the case case against Kilcoyne "not proven" instead of not guilty.

In 18 undistinguished years of service on the bench, Kilcoyne has repeatedly come up short in both his personal and judicial conduct. Off the bench, tales of his after-hours exploits are legendary. On the bench, he has proven unfit to serve.

Charges against an alleged murderer were dismissed in 1982 because Kilcoyne's docket was so backed up the defendant wasn't brought to trial soon enough. Kilcoyne's docket was once so backed up that some of his cases were distributed to other judges.

Then there was the 1985 case where Kilcoyne dismissed a murder charge against a man accused of killing a drug informant, ruling the alleged killer had not been brought to trial within 270 days as required by state law. The Ohio Court of Appeals ruled that Kilcoyne couldn't count and reversed Kilcoyne's wrong decision.

Former County Prosecutor John T. Corrigan said it best back in 1988:

"Judge Kilcoyne does not deserve to be on the bench. He's despicable, and he's hurting a lot of people. If I ever get the evidence on him, you can bet I'm going to use it."

Corrigan never got enough evidence on Kilcoyne to prove the judge a felon. Neither did his successor, present Prosecutor Stephanie Tubbs Jones.

But as a consolation prize, both can rest secure in the knowledge that most Greater Clevelanders now have Judge James F. Kilcoyne's number. They know he's a disgrace to his profession. They know he's a bad judge who abused his office and discredited his name.

And they know he's a bum.

*Larkin is director of The Plain Dealer's editorial pages.*

THE PLAIN DEALER

10-1-91

**METR**

## JOE DIRCK

### COMMENTARY

# A rich lesson in 'the way society works'

It was a light morning for Common Pleas Judge James F. Kilcoyne, who's still working himself back into playing shape after an 18-month absence from the bench, due in part to injuries he suffered in an auto accident and in part to the fact that he was busy defending himself against charges that he was a crook.

There wasn't much on his docket yesterday morning. He granted a continuance in a drug case and accepted a plea bargain prosecutors had worked out with a thief. Pretty routine jurisprudence dished out by a most imprudent jurist.

But he had to be happy just to be there. As Kilcoyne painfully hobbled to his elevated desk and took his seat, framed by the flags of the United States and the state of Ohio, it must have crossed his mind that things could have turned out a lot differently.

Two weeks ago, he was cleared of defrauding insurance companies of the $1 million he collected following his 1987 accident on the Shoreway. Visiting Judge Robert Ford, who heard the case without a jury, acquitted Kilcoyne on one charge of falsification. Five other charges, including perjury, grand theft and tampering with evidence, had been dismissed earlier by Ford.

The happy result must have been yet more proof to Kilcoyne that the system really works. From the beginning, in fact, the system seems to have bent over backward to be fair to him.

Some might say it was more than fair.

Take the night of the accident. His car plowed into a parked and disabled car on the Shoreway ramp, and he was rushed to a hospital where emergency room personnel noted his "highly intoxicated and stuporous condition," according to a prosecutor's brief.

But the police who investigated must not have noticed, because they did not charge him with driving under the influence, even though a blood test showed a blood-alcohol level of 0.22%. (In Ohio, 0.10% is considered drunk; 0.22% is considered passed beyond belief.) Funny thing about that blood test — it kept disappearing from the judge's medical chart.

Having escaped a potential DUI rap, Kilcoyne took the insurance companies to arbitration and won big — more than $900,000 from one even though he'd only asked for $750,000. A second company gave him another $100,000. As it turns out, one member of the arbitration panel was an associate of Kilcoyne's lawyer and another was a former Common Pleas judge who'd served with Kilcoyne. Small world.

That might have been the end, but then the Cuyahoga County prosecutor went to the grand jury and got Kilcoyne indicted on all those criminal charges. Motions filed by Assistant Prosecutor Timothy J. McGinty alleged that, on the night of the accident, Kilcoyne and a lady friend (not Mrs. K) visited a number of bars — not just one, as he had claimed.

A doctor said Kilcoyne confessed he was a binge drinker who doesn't eat when he's boozing because it gets in the way of the "buzz." He told the doctor his drinking problem had grown so bad he even was drinking "in trial."

Other evidence showed that less than a month before the accident, Kilcoyne had been found passed out in front of one bar and had been ejected from a nude bar for obnoxious behavior. Presumably, you have to be really obnoxious to get tossed out of one of those places.

But none of this testimony and evidence was admitted by Ford. And with Ford's not-guilty ruling on the one charge he didn't throw out, Kilcoyne was a free man.

Did Kilcoyne get special treatment because he was a judge? As his lawyer, Gerald Messerman, said during the trial, "If certain people extended themselves on behalf of him, so be it. That may be the way society works."

Yes, counselor, it may — and that's just what frosts the rest of us. We know if we got blind drunk and had an accident, nobody would give us a million bucks and a get-out-of-jail-free card.

But Kilcoyne didn't appear to be worried about any of that yesterday. Why should he? He's back at work, passing judgment on others at $83,300 a year.

What a country, huh?

10-2-91

# THE PLAIN DEALER

Sesquicentennial Celebration
THOMAS VAIL *Chairman*

**ALEX MACHASKEE**
*President and Publisher*

**THOMAS H. GREER**
*Editor*

**STANLEY H. ROSENBERG**
*Vice President, Business Manager*

BRENT W. LARKIN *Director of the Editorial Page*

# Get Kilcoyne off the bench

It's time for James F. Kilcoyne to leave the Cuyahoga County Common Pleas bench.

Today.

Before the sun sets on another 24 hours of his disgracing presence.

Kilcoyne holds the office of judge. He was put there by voters to represent probity and temperance in the administration of justice. But he has come, rather, to represent everything that responsible people despise in officialdom gone rotten. He embodies the "old-boy" system, where no matter how rank the offense, the miscreant always seems to escape punishment.

Just days ago, Kilcoyne was found not guilty of criminal charges evolving from a 1987 traffic accident. The judge who heard the case said he wished he had the option of deciding the case "not proven" rather than "not guilty."

Testimony during that trial described Kilcoyne as a regular drinker who had a 0.22% blood-alcohol level when he plowed into a disabled vehicle. It showed that he took advantage of his position to beat a drunken driving charge and intimidated doctors into removing damaging information from his medical records. Then he collected more than $1 million in insurance money.

Kilcoyne returned to the bench immediately. But this week, the court's administrative judge, Frank L. Gorman, removed Kilcoyne from a case involving a drunken driver, saying it was "inappropriate" for him to handle it.

Inappropriate for him to handle it? What, then, is appropriate for this jurist's judgment? Is Kilcoyne to be some small fraction of a judge, handling only such cases as do not cross his own sordid past? Those untainted cases will be few and far between, indeed.

During the trial, Kilcoyne's lawyer, Gerald Messerman, rubbed salt in the public's wound: "If certain people extended themselves on behalf of him, not having been requested to do so, so be it. ... That may be the way society works."

Here, also, is the way society works: It demands that Kilcoyne take his ill-gotten insurance money and vacate the bench.

If he refuses to do so, the local bar associations must immediately start proceedings to have him removed. The procedure is simple: Under Ohio Supreme Court rules, a judge can be removed for (a) failing to perform his duties, (b) being habitually intemperate or (c) bringing the judicial office into disrepute. Kilcoyne abundantly meets all those requirements.

It's a travesty that the man remains on the court. Whether through resignation or removal, Kilcoyne must depart. It is not fit that he sit there any longer. For the sake of justice and the integrity of the office he now sullies, he must be gone.

THE PLAIN DEA...

10-8-91

■ OBITUARIES/6-B
■ DEATH NOTICES/7-B

METI

**JOE DIRCK**

COMMENTARY

# Oh, lawyers, who needeth 'em anyway?

Several recent stories have pretty much convinced me that —— Shakespeare had it right when he proposed, "Let's kill all the lawyers."

Yeah, let's. What do you say we line 'em up against a wall, give 'em a last cigarette, and....

Oh, you're probably right. It would never work. They'd just get an injunction or a restraining order or something. They're tricky that way, you know.

So I guess we'll have to go on tolerating them. Shakespeare probably came to the same conclusion, because he never mentioned his idea again.

But if we ever did choose to adopt Shakespeare's solution, I can think of a few candidates I'd put at the head of the line. One, of course, would be Common Pleas Judge James F. Kilcoyne. In whom I devoted a whole column last week. But he's such a crumb he deserves an encore.

This is not just my opinion. Few columns I've written have generated so many attaboys from readers who were just as hooked off as I was at the way Kilcoyne beat the system. Although a blood test showed his alcohol level was twice the legal limit when his car rammed a parked vehicle, Kilcoyne not only was not charged with driving under the influence, he was awarded $900,000 in insurance payoffs from an arbitration panel of — who else? — lawyers.

Another lawyer who would be high up on my hit parade is William A. Hamann. Actually, he's a former lawyer now, having relinquished his license after he was caught stealing more than $2 million from estates and trusts he handled. Grave-robbing, lawyer-style.

Hamann said he stole the money to finance his kid's dream to be an Olympic equestrian — and, well, you wouldn't believe the price of hay these days. The Hamanns lived in an $550,000 home, owned four expensive horses and traveled in a $245,000 mobile home, with a marble bathroom, no less.

At his sentencing last week in Cuyahoga County Common Pleas Court, Hamann pleaded for mercy and even had the brass to cite precedents to Judge Kathleen Ann Sutula and suggest that in his professional opinion, leniency was in order. Hamann's wife, Lynda, asked the judge to consider how much her husband had already suffered during "his four long weeks in jail."

Unmoved by this tender scene, Sutula sentenced Hamann to 84 to 120 long years in prison. Maybe if he's lucky he'll go somewhere with an honor farm and get a job mucking out stalls.

But Hamann's greed is noteworthy only for its degree. As an investigation by The Plain Dealer's Lorain Bureau has shown, a lot of lawyers in Lorain County are growing fat feeding at the public trough.

Some lawyers appointed to defend indigent clients are shamelessly inflating the bills they submit, often billing for more hours than the courts are open. This is occurring against the backdrop of a fiscal crisis in Lorain County, brought on in large part by runaway criminal justice costs.

One of the worst offenders is Avon lawyer Jack S. Malkin, who once billed the Elyria Municipal Court for 21½ hours' work in a single day, which seems unlikely unless the courthouse has a flashing neon sign: "WE NEVER CLOSE."

Malkin, who favors Gucci shoes and BMWs, once began billing for an indigent client more than a month before the man was even arrested. Why wait until the last minute?

He did most of his business — $32,700 over a period of 18 months — with Elyria Municipal Judge John Howard's court. Howard's assignment commissioner, Sherry L. Campbell, approved Malkin's bills with the judge's signature stamp and appears to have steered appointments Malkin's way.

Oh, did I mention that Campbell and Malkin had a social relationship? Purely a coincidence, I'm sure.

I'm not sure what the lawyers were up to in Shakespeare's day, but I suspect if he were around now, he wouldn't have dropped his idea so quickly.

10-20-91

2·C

# THE PLAIN DEALER

Sesquicentennial Celebration

THOMAS VAIL *Chairman*

ALEX MACHASKEE
*President and Publisher*

THOMAS H. GREER
*Editor*

STANLEY H. ROSENBERG
*Vice President, Business Manager*

BRENT W. LARKIN *Director of the Editorial Page*

# Remove Kilcoyne, Donaldson

Two area judges who don't belong on the bench are reportedly being scrutinized by the investigatory arm of the Ohio Supreme Court. This welcome news will get even better if the court follows through by acting to remove Cuyahoga County Common Pleas Judge James F. Kilcoyne and Shaker Heights Municipal Judge Paul R. Donaldson from office.

It is unconscionable that Kilcoyne continues to sit. True, the veteran judge escaped conviction on a variety of criminal charges stemming from his 1987 traffic accident. But he also escaped with more than $1 million in ill-gotten insurance money for plowing into a disabled car with a 0.22% blood-alcohol level. Suffice to say that Kilcoyne's conduct on and off the bench has, for years, demonstrated such contempt for American jurisprudence as to constitute a travesty.

The case against Donaldson, while far less compelling than that against Kilcoyne, grows stronger with each day the judge thumbs his nose at the citizens of Shaker Heights by remaining in Arizona. Citing stress and diabetes, Donaldson went to the southwest, supposedly for a few weeks, on Sept. 3.

He hasn't been back since, but has continued to collect his $78,000 salary, while the city forks over $148.20 a day to visiting judges. The judge's bailiff-wife, Kathleen Leishman-Donaldson, has been on an unpaid leave since August. Meanwhile, the couple has vacated their Shaker Heights home and are attempting to sell it.

For now, the criminal investigation into possible theft-in-office charges against Donaldson and his wife should not be factored into any investigation of his conduct, as the allegations are unproven. But the judge remains in Arizona without demonstrating the decency to inform either Shaker Heights officials or residents of his future plans. That's enough to warrant his removal.

Under Ohio Supreme Court rules, a judge can be removed for (a) failing to perform his duties, (b) being habitually intemperate or (c) bringing the judicial office into disrepute. Kilcoyne meets all those tests. Donaldson qualifies on at least two of them. If they don't leave the bench voluntarily, the Supreme Court should force them to leave.